# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-21-00501-CV
---

**Tony Dinwiddie, Appellant**

**v.**

**Margaret Danielle Pottin and Jennifer Ann Francis, Appellees**

---
### FROM THE 169TH DISTRICT COURT OF BELL COUNTY
### NO. 323928, THE HONORABLE CARI L. STARRITT-BURNETT, JUDGE PRESIDING
---

## M E M O R A N D U M   O P I N I O N

Tony Dinwiddie appeals from the trial court's order terminating his parental rights to his son "K.J." We affirm the trial court's termination and adoption order.

## FACTUAL AND PROCEDURAL SUMMARY

K.J. was born in January 2019 to Dinwiddie and Patience Barnes. In mid-2021, appellees Margaret Danielle Pottin and Jennifer Ann Francis filed a petition to terminate Barnes' and Dinwiddie's parental rights and to be named K.J.'s adoptive parents.[1] On August 5 and 14, 2021, Dinwiddie and Barnes executed affidavits of voluntary relinquishment of their parental rights, designating Pottin and Francis as managing conservators, and those affidavits were filed in the trial court on August 26. On August 31, however, Dinwiddie wrote a letter to the trial

---

[1] The original petition was filed in April 2021 by Pottin as sole petitioner. In June, after they married, Pottin and Francis filed an amended petition naming them both as petitioners. Pottin has since changed her last name to Francis, but for clarity's sake, we will refer to her as "Pottin" and to her wife as "Francis." Barnes is not a party to this appeal.

court stating, "I am writing this letter to state my intent of NOT relinquishing my rights." He asserted that he signed the affidavit "under duress and pressure" and without giving himself time to discuss it with his parents because Pottin had told him "that the paper was reversible." He said Pottin had told him that he "would still have all the rights," that the affidavit was necessary "for her to be able to give [K.J.] an education," and that Dinwiddie "would still be dad and still have say so," but after he signed, "started actually enforcing" it, withholding K.J. and saying that "the court ordered it." Dinwiddie said Pottin had "disregarded [his] feelings" and was going forward with the termination and adoption process.

On September 30, the trial court held a termination/adoption hearing. Dinwiddie appeared pro se and before testimony began told the trial court that he was not in agreement with the termination of his parental rights and that he had signed the affidavit "just kind of on a trust-basis system. It was more for kind of guaranteed use of GI Bill for financial benefit for" K.J. He stated, "I was informed that the paper was reversible, and that if I didn't like the process that was going on, that we could terminate what was going on. I was basically misinformed." He admitted that he had read the affidavit and agreed when the trial court asked if he had read "the parts where it says the reverse of everything you're saying to me right now," but said, "Honestly, I could barely sign it whenever I read it, and it seemed like I was—honestly, I was kind of bullied and I was under duress whenever I did sign it." Dinwiddie insisted, "I was under the belief that I was still going to be the father and I was going to be the main caregiver." However, Dinwiddie admitted that so far in K.J.'s life, he had not been the primary caretaker.

Barnes testified that Pottin started as a babysitter but that her caretaking became "more frequent. And then [K.J.] just has been with her like most of the time." Barnes also said she and Dinwiddie had voluntarily left K.J. with Pottin and Francis for more than six months and

2

never had "an intent for it to be a temporary situation." She explained that she had been in a substance abuse felony punishment facility (SAFPF) and that since her release, "this has been talked about. We've talked about this the day I got home and came to see my son where he was. At their house, that's where he was whenever I came home." She said that "one of the first things we talked about is making this a final thing." Barnes testified that she, Dinwiddie, Pottin, and Francis had agreed that Dinwiddie and Barnes were "[d]efinitely still going to be involved, but [that Francis and Pottin] would have all of the responsibility of being a parent."

Barnes "[d]efinitely" believed it was in K.J.'s best interest for him to remain with Pottin and Francis and not to be in Dinwiddie's care. She explained that Dinwiddie works nights and that "it's just easier for them to care for all of his needs." Further, she said, Dinwiddie is "not seasoned on being—on what he needs to do for" K.J. and "has never had another child before, so he just doesn't know exactly what [K.J.] needs when he needs it. He just doesn't know." Barnes testified that she wanted her and Dinwiddie's rights to be terminated and Pottin and Francis to adopt K.J., saying, "I want this to happen. I want the paperwork to go through the way we signed it. I think that's what's best for K.J."

Denise Johnson, an investigator for the Texas Department of Family and Protective Services, testified that the Department had investigated a report of neglectful supervision and possible sexual abuse. When she spoke to Dinwiddie, he denied that he had left K.J. home alone but admitted "that at one point he did hire a babysitter off of Facebook" because he had to go to work. Dinwiddie also reported that the last time he had seen K.J. in person or had him "in his custody or in his care, like away from the home, was in July," telling Johnson that Pottin and Francis "had had the child out of state and the child primarily resided over there. He had been having supervised visits with [K.J.] at that home since July."

3

Johnson testified that she told Pottin and Francis that the Department

> would not get in the middle of child custody. If this was the custody agreement, we would do—our investigation is to ensure the safety of the child. I said that if they're the . . . the guardians of [K.J.], it was their job to make protective parenting choices for the child. If they believe that the child was not safe with Mr. Dinwiddie and they were supervising the contact with him, then by all means. At no time did we directly say, like, as a result that they should not allow him to have access to the child. They were already supervising his contact with the child before the [D]epartment was ever involved.

Johnson testified that Dinwiddie, as a first-time parent, "was provided with resources in the community on parenting classes and things that could better help him as far as learning to be a better parent" and that he had started a parenting class. Dinwiddie has a job, receives food stamps, "has the child on Medicaid," and "has a home, the child has a bed over there, the child had appropriate sleeping arrangements over there. There was food in the home. So he appears to be able to meet the child's basic needs." She did not know what income Dinwiddie had declared in seeking governmental benefits, what kind of job he had, or whether it was legal.[2]

Dinwiddie testified that he deals cards for a social club, no longer deals cards for private games, and has tried to move from working five nights a week to three so that he can be more involved in K.J.'s life. Dinwiddie testified that he "came to agreement with Ms. Pottin" because "just the fact that I work five nights a week, I didn't have the means to, you know, have him taken care of. I couldn't be at work and have my child at home by himself." Dinwiddie stated that he would sometimes provide groceries and would leave cash "[s]ometimes when I was able to"—he thought he had provided cash in the last six months but could not say when.

---

[2] Johnson was asked whether Dinwiddie had fraudulently obtained government benefits by failing to disclose his "job as an illegal card dealer," answering that she did not "know what information [was] used or what income he disclosed."

Dinwiddie testified about his signing the affidavit of relinquishment as follows:

> I just feel like I didn't—I didn't get the proper time to go over the paper that I signed. And I understand that I felt bullied and pressured to do it that day because I had undeniable trust for Ms. Pottin. And, you know, I—I mean, I didn't want to lose my rights as a father. I never did agree to that. Whenever I signed the paper, I made it a point that I wasn't going to abide by it. And she said, It's okay, we're just going to do this for the schooling. But she said that you would be dad and you would have the responsibility of being his father still. And ever since I signed that paper, I haven't like—it's been forced out of my hands. I can't even visit my child sometimes. Sometimes I text and call, and I won't get a response until the evening, the day after. And I honestly don't—I didn't sign up for that. I couldn't sign up to lose my rights. I didn't—I just felt even though I'm inexperienced as a father, I asked them to help and not take over.

Dinwiddie was asked whether he understood that to revoke the affidavit, he had "to basically do the same process" as when he signed it, and whether he had done any of those steps, and he said, "I don't understand how this process works." He agreed that he can read and write the English language, said that he had "probably about close to three years of college education," and said that he signed the affidavit because he "had 100 percent trust for Ms. Pottin, because she was doing a good job taking care of my son." However, he said, "I was under agreement that I would still be the dad, and I would have all of the rights. Like—I was informed that it was just simply doing this for him to have a college education after school."

The trial court asked Dinwiddie if he would want to retain his rights and pay twenty percent of his income as child support to Pottin and Francis, and he answered:

> No, I don't want that. I want to take care of my son. And if we need to work out financials to where I have to pay them for baby-sitting, then that would be between us. But I prefer not to do that. I'm taking care of him anyways. I have provided diapers and all of his clothes and toys. I provided about 80 percent of the stuff.

5

Dinwiddie did not dispute that Pottin and Francis had been "primarily" caring for K.J. but said, "Just because they kind of forced it out of my hand after I signed the paper." He told the court that in the last four months, he had only had K.J. "maybe three to four nights" and said, "I didn't sign up for that."

Pottin testified that she met K.J. in February 2019, when he was about one month old, because her daughter babysat for K.J. and would bring him to Pottin's house. When her daughter moved out of state, Dinwiddie and Barnes asked Pottin to care for the baby, so she started babysitting part-time in June 2019, increasing her time as K.J.'s caretaker after she retired. Soon after K.J.'s first birthday, Pottin "lost contact with" Barnes:

> And things—eventually time went on and we found out months later, almost a year, that it was because she had—was dealing with her own issues and went to jail. But from that point forward, I started taking care of him the majority of the time especially once I found out he was still continuously going to the Facebook baby-sitters when I couldn't take care of him. And I was like, No. So I was able to take care of him a lot more. So June 2019 I became almost his full-time provider. Tony wasn't working seven days a week at that time. It was maybe five days a week. So he was with Tony two of those days, yes. And then over time, it just—he never left the house. He was there and it was more so, Tony, I'm going to bring [K.J.] over at naptime because I need to go to a doctor's appointment for you to watch him. But knowing Tony works the hours he does, that's why strategically at naptime, he would go and care for him, or I would take him over to care for him and pick him up or Tony would drop him off before work. And that has been the relationship this entire time.

Pottin testified that K.J. had been spending nights at her house for more than two years and that Dinwiddie had voluntarily left K.J. with her for more than six months and had never said "on such and such time or when such and such happens, y'all can come back for him." He had left groceries "the other day" but Pottin said that he had not given her any cash in the last six months.

6

Pottin testified about the day Dinwiddie signed the affidavit of relinquishment and said she and he went to the UPS Store and waited in a long line so that he could sign the document in front of witnesses and have it notarized. She testified that she did not "do anything to threaten or coerce him" and that he was impatient about the line because he was running late. Asked whether she and Dinwiddie discussed the revocability of the affidavit, Pottin answered:

> Yes, he did ask about it. And clearly it states on the paper. So I gave him—I told him, yeah, it can be revoked, Tony. It can go back. Nothing has changed as you being a father. He's like—all of this time, in the age, he's like a son honestly. That's—like my grandchild, having Tony is like my son.

Pottin testified that she offered to make Dinwiddie a copy of the affidavit, and he said, "No, I don't want that. I don't want that in my house. The words that are written on there are not even something I want to . . . have in my home." She believed that Dinwiddie "doesn't understand those things [related to revocation] because he chose not to take a copy of it." She further testified that regardless of the trial court's ruling, Dinwiddie is "still [K.J.'s] father."

Francis testified that she has been in the military for twenty-three years and that before meeting Pottin, K.J., and K.J.'s parents, she had decided to focus on her career rather than having children. She said that since becoming involved with Pottin and K.J., however:

> nothing is obviously more important than taking care of this little human being. Not even my career. And I am 23 years in and I'm very successful. And I just want to set him up for success, set up this family for success. And it's more than a GI Bill, sir. It's more than any medical that I can ever provide. It's teaching, learning, waking up, taking him to the potty. And I can go on and on. But I'm just an outsider looking in, but very much so involved in [K.J.'s] life. I love that little boy. He's not mine. He has a father. He has had a mother. And I just want to do the very best to set him up for success and be what I can as far as a parental guardian, parent. Whatever I need to be, I'm there.

7

Asked about "the sexual abuse allegations," Francis testified that she did not know very much about it but that she had seen injuries around K.J.'s anus.[3] She explained that they found the sores after Dinwiddie dropped K.J. off. K.J. acted constipated and "react[ed] in excruciating pain," and Francis said that "it was not normal," so she and Pottin took him to his primary physician and then sought a second opinion "just to find out a little bit more."

Pottin and Francis called Nicole Richards to testify. Richards had also babysat for K.J. and said she started to watch him more often when she "found out that [Dinwiddie] was using the Facebook babysitter more frequently." Richards also said that K.J. "had been showing signs of constipation and always never being able to poop," and that she "noticed sores and cuts" on his anus in about March. Although she had dealt with babies her "entire life," she "had never seen anything like that before." Richards also testified that Dinwiddie had denied neglecting K.J. but admitted that he once left K.J. alone in the middle of the night while he went shopping. Richards thought Dinwiddie "has a potential to be a good parent" but "is very lazy about it" and did not think unsupervised access by Dinwiddie was in K.J.'s best interest.

The trial court also considered a September 29, 2021 report filed by adoption investigator Suzy Lackmeyer. Lackmeyer stated that K.J. had been born with drugs in his system and had had "some speech and hearing difficulties" but was receiving services to address those issues. Lackmeyer reported that Barnes primarily maintained her relationship with K.J. through phone calls and video calls and was expected to continue that relationship in the future. Dinwiddie, however, "visit[ed] once or twice a week overnight" up until July 27, 2021, but now "makes plans and cancels," and Lackmeyer said, "He is not expected to have a relationship with

---

[3] As described later, the sores were determined to be pressure ulcers and the concerns about possible sexual abuse have been resolved.

8

[K.J.] in the future." Lackmeyer said that Pottin and her daughter were babysitters and that one day Dinwiddie and Barnes "just did not show up to pick him up," at which point Pottin became K.J.'s caregiver. At the time of Lackmeyer's report, K.J. had lived with Pottin and Francis "for over two years. They have bonded to him and wish to provide him with a permanent, loving and safe home." Lackmeyer concluded, "This adoption appears to be in the best interest of [K.J.]."

At the conclusion of the September 30 hearing, the trial court found that "the affidavit of relinquishment is valid and not revoked properly" and that "termination of both parents' rights [is] in the best interest of the child." It also stated that it was appointing Pottin and Francis as K.J.'s adoptive parents. On October 1, the trial court signed an order to that effect, finding that Dinwiddie had executed an unrevoked or irrevocable affidavit of relinquishment; voluntarily left K.J. alone or in the possession of a non-parent for at least three months without expressing an intent to return and without providing for the child's adequate support; and voluntarily left K.J. alone or in the possession of another for at least six months without providing adequate support. *See* Tex. Fam. Code § 161.001(b)(1)(B), (C), (K). That same day, Dinwiddie filed a letter asking the court to reconsider its decision to terminate his parental rights; in mid-October, he retained an attorney, who filed an amended motion for new trial; and on October 21, he filed a witnessed and notarized revocation of affidavit.

On November 18, the trial court held a hearing on Dinwiddie's motion for new trial. Dinwiddie denied that at the time he signed the affidavit, K.J. was already "staying with somebody else outside of [Dinwiddie's] family," testifying that Pottin "was a babysitter" and "was helping." Dinwiddie said that he did "things that fathers would do. Walk with him, play with him, take him to the duck pond, feed him, clothe him, bathe him. Pretty much everything that you have to do as a parent just to keep him alive pretty much." He testified that he had

9

"provided everything that [K.J.] did need" and that he brought food, "diapers, clothing, toys, playgrounds, everything for him." He admitted that he never provided Pottin with cash but said that she "never did ask for cash." He also testified that he "paid for the services, even though she said that I didn't pay for. I did. It wasn't much but I did pay for childcare."

Dinwiddie said that Pottin brought up adoption "because she wanted to pass the GI Bill to" K.J., telling Dinwiddie and Barnes "that she wanted us to be able to provide him with a college education down the line, and that was the only reasoning for the adoption." Dinwiddie testified that Pottin "promised that I would be the father, and that I would be the main provider at all times," but that after he signed the affidavit, she and Francis had "completely just not even talked to me, not even allowed any contact with my son, no video chats, nothing. It—just act like I don't exist." Dinwiddie insisted that Pottin gave him those assurances throughout the process of signing the affidavit, saying that she "always assured that it was just for passing the GI Bill and that was it. I wasn't—I was going to still continue to be the father and the main provider." Dinwiddie explained that after he signed the document, he still saw and video-chatted with K.J. at least every other day. Pottin went to Washington twice, and Dinwiddie said it "was only supposed to be for two weeks but ended up being two month long time, kind of vacations," during which time he did video conferences with K.J. Dinwiddie testified that after the hearing on September 30, however, he "was not allowed to see [his] son anymore at all," and asked what had changed, Dinwiddie replied, "I guess they won and they felt like they didn't need me to be a part of my son's life, and they didn't allow any contact at all. I felt like that's not fair to my child because my child loved me and still loves me." Dinwiddie denied that he had texted Barnes "asking her to take [K.J.] to the duck pond so y'all could take off," saying that that allegation was "absolutely false." He said that he had texted Barnes simply "to spend some time

10

with our child at the duck pond" and that he had "no ill intentions to take off and run" or to "kidnap my own child. I don't even know where that came from."

Dinwiddie also testified that Pottin and Francis had never told him that they were moving to Virginia. He denied having any conversations with Francis "in June and July about going to Virginia to visit" K.J., saying, "No, because I never would talk to Ms. Francis. This was a relationship between me and Ms. Pottin." Dinwiddie said Pottin "has not talked to me about anything. The reason why I learned that she moved was through my lawyers." Dinwiddie denied that the issue of Pottin and Francis moving had come up during the September 30 hearing and insisted that he was not aware that they had moved to Virginia.

Dinwiddie testified that between August 5, when he signed the affidavit, and September 30, he was never told that he was going to be cut off from K.J. or that Pottin and Francis would be moving to Virginia. Had he known those facts, he said, he would "[a]bsolutely not" have signed the affidavit. He said, "I want to be my son's father, and I want to be there for the rest of his life. Like I never did agree to give up my parental rights officially. I just signed the papers because like I said, I was promised that she would provide the GI Bill and insurance." Dinwiddie also said he "absolutely" relied on Pottin's assurances that he would continue to be K.J.'s father and "main provider" because "she was like a mother to me. Like I have no reason not to doubt her." Dinwiddie admitted that he never asked a lawyer about how to revoke his affidavit or obtained a copy of it from the district clerk's office, and when he was asked why he did not get a copy when he went to the clerk's office to file his October 1 letter to the trial court, Dinwiddie answered, "I don't know, sir."

Pottin agreed that she had told Dinwiddie that he would be able to see K.J. and "have a father relationship" after he signed the affidavit of relinquishment, although the affidavit

11

of relinquishment states "words to the effect of this terminates your parental rights forever." Indeed, she said, he continued to have contact with K.J. until he texted Barnes about bringing K.J. to a duck pond, explaining that "[t]he way it was stated made me feel as if he was trying to take [K.J.]. He wanted [Barnes] to bring him. So at that point, that's when my mom instincts kicked in and that's his safety." Pottin had "slowed down" Dinwiddie's access because of that incident and "his actions with [Barnes]," testifying that she did not "feel safe around him if he's going to act the way he did in such a manner." As for Dinwiddie's "actions with" Barnes, Pottin was permitted to testify only that Barnes "came back very distraught after going over to Mr. Dinwiddie's house to get her things" and that Pottin "fear[ed] for the child and [Barnes's] safety being around Mr. Dinwiddie after that."[4]

---

[4] Barnes wrote a letter to the trial court stating that she could not attend the new-trial hearing because of work. She stated that Pottin and Francis had cared for K.J. because she and Dinwiddie had been unable to provide a safe and stable environment. Barnes reiterated that she believed allowing Pottin and Francis to adopt K.J. "was the best decision I could have made for him." Barnes also wrote:

> Unfortunately due to the actions of [Dinwiddie], following the adoption [Pottin] has done what she felt necessary to keep [K.J.] safe; these actions include sending disrespectful and ugly messages to both [Pottin] and I. He asked me to bring [K.J.] and meet with him at CTC to feed the ducks without telling [Pottin]. He was also very aggressive with me in a sexual manner when I came to his house to get my belongings, while apologizing at a later date, saying he did not realize how his actions affected me. In my experience with [Dinwiddie], he acts out on emotion and expects no consequences. I was unable to remove all of my belongings and [Dinwiddie] told me they would be safe there until I could come get them. In the last month he has informed me he found an old diary of mine from when I was in active addiction and was thinking of showing it to the Judge. He has also told me my things were gone, donated or sold only to tell me he still has them. I'm not sure what his true intentions are in doing this, or why he felt it necessary to act in this manner. While I am positive [Dinwiddie] loves [K.J.], his actions portray a lack of stability both mentally and emotionally that are crucial to a healthy environment for raising a child.

Pottin testified that her family had moved to Virginia sometime after the September 30 hearing and that when Dinwiddie signed the affidavit, neither he nor Pottin herself knew that K.J. would be moving. However, Pottin disputed that Dinwiddie was never made aware that the family was moving to Virginia. She testified that although the "exact words 'K.J. is moving to Virginia' were not stated," she, Francis, and Dinwiddie had discussions about going to Virginia and that she assumed he understood because he "never questioned or anything." In addition, Pottin testified, Dinwiddie knew that Francis was stationed in Virginia, he and Francis spoke about his visiting them in Virginia, and Pottin spoke to him "about having to move."

Pottin said that, among other concerns, ongoing legal proceedings would interfere with K.J.'s medical appointments, saying:

> In order for us to gain some type of consistency with [K.J.] and get him on track to where we know his health and mental stability are, you know, to where they need to be for a three-year-old child, right now after we took him to his primary care doctor, he has a referral in for pediatric gastroenterologist, pediatric psychologist. For his hearing, he has to have his adenoids and his tonsils removed so that he can have tubes placed in. There are many, many medical appointments that we're already starting to set up for him. And if we have to constantly interrupt that, we're never going to get to a state where [K.J.] is, you know, mentally, physically emotionally stable.

Pottin testified that such appointments were not routine before she got involved in K.J.'s life. Pottin also explained that they took K.J. to a gastroenterologist because he was suffering from "extreme pain, constipation, his anus was red, swollen"; he was throwing up; and after returning from time with Dinwiddie, he had "big welts on his backside." The doctor determined that the welts "are called pressure ulcers" and told Pottin that such ulcers happen to "somebody that's been sitting in a spot that's wet for a long period of time." Pottin said she asked Dinwiddie "where those came from," and he responded, "I don't know." Pottin further testified that if there

13

was a new trial, she and Francis could bring forth new evidence "of abuse and neglect grounds to terminate his rights."

Francis testified that Dinwiddie knew that her duty station was in Virginia and that she had had conversations with him about his coming to visit K.J. in Virginia. She acknowledged that she never specifically told Dinwiddie that K.J. was moving but said that she asked him in May if he would come visit the child in Virginia. She further testified that her and Pottin's long-term plan, after Francis retires from the military, is to return to Texas. She agreed when asked whether "to the extent that the goal is to try and keep everybody together, including Mr. Dinwiddie, including Ms. Barnes, that would happen here."

Francis denied that she and Pottin intended to keep Dinwiddie out of K.J.'s life in the future and said, "As it transpired, we say father rights and, you know, your role as a father, care giving, you use that very loosely." She explained that being "a sole provider is a constant, steady paycheck," but that in the nine months she had known Dinwiddie, he had provided "little to none. And it takes more than that." Francis testified that K.J. "was born as a meth baby" and needed "to be provided and loved in more than what [Dinwiddie was] doing maybe once or twice a week and at odd hours or right before work or trying to pick him up at 0200 in the morning." According to Francis, Dinwiddie was "given [an] ample amount of time" and that it was "always on [his] time. Not [K.J.'s] time." She also said that Dinwiddie works "at zero dark until zero," and that she and Pottin "will not wake up a two and a half year old to accommodate father roles." Francis explained that Barnes's hours made virtual contact with K.J. "more feasible" and that she and Pottin "accommodate it when we can," testifying that if Dinwiddie "would maybe go about it in a different way," he "would have the same rights as" Barnes.

14

**DISCUSSION**

Dinwiddie lists six presented issues, arguing that the trial court erred in finding statutory grounds for termination and in finding that termination of his rights was in K.J.'s best interest. We turn first to his second, third, and fourth issues, which challenge the trial court's finding that termination could be based on Dinwiddie's affidavit of relinquishment.

A trial court may order termination of a parent-child relationship if it finds by clear and convincing evidence that termination is in the child's best interest and that the parent has "executed before or after the suit is filed an unrevoked or irrevocable affidavit of relinquishment of parental rights as provided by this chapter." Tex. Fam. Code § 161.001(b)(1)(K), (2). Section 161.103 provides that an affidavit for voluntary relinquishment of parental rights must be signed no earlier than two days after the child is born, witnessed by two people, and verified before a person authorized to take oaths. *Id*. § 161.103(a). It must include a statement "that termination of the parent-child relationship is in the best interest of the child"; a designation of a prospective adoptive parent, if applicable; and "a statement that the relinquishment is revocable, that the relinquishment is irrevocable, or that the relinquishment is irrevocable for a stated period of time." *Id*. § 161.103(b)(6), (9), (12).

"An affidavit of relinquishment that meets the requirements of section 161.103 of the Texas Family Code is prima facie evidence of its validity." *In re A.R.M.K.*, 588 S.W.3d 692, 699 (Tex. App.—Amarillo 2019, no pet.).

> Once the proponent of a relinquishment affidavit has established by clear and convincing evidence that the affidavit was executed according to the terms of section 161.103 of the Family Code, "the affidavit may be set aside only upon proof, by a preponderance of the evidence, that the affidavit was executed as a result of coercion, duress, fraud, deception, undue influence or overreaching."

15

*Vela v. Marywood*, 17 S.W.3d 750, 758 (Tex. App.—Austin 2000, pet. denied) (quoting *In re Bruno*, 974 S.W.2d 401, 405 (Tex. App.—San Antonio 1998, no pet.)). In seeking to overcome an adverse fact finding, the parent contesting an affidavit "must surmount two hurdles." *Id*. at 759-60 (quoting *Sterner v. Marathon Oil Co*., 767 S.W.2d 686, 690 (Tex. 1989)). "First, the record must be examined for evidence that supports the . . . finding, while ignoring all evidence to the contrary," and if there is no evidence to support the finding, "the entire record must be examined to see if the contrary proposition is established as a matter of law." *Id*. (quoting *Sterner*, 767 S.W.2d at 690).

Coercion is generally defined as compulsion through physical force or threat or through improper use of economic power; misrepresentation is a falsehood made with the intent and purpose to deceive; and fraud "refers to an act, omission, or concealment in breach of a legal duty, trust, or confidence justly imposed, when the breach causes injury to another or the taking of an undue and unconscientious advantage." *Id*. at 760. "In the context of fraud, courts have stated that misrepresentation is making a false statement of fact or a false expression of opinion by one claiming or implying special knowledge," and "[s]ilence can constitute a misrepresentation" if "the particular circumstances impose on a person a duty to speak and he deliberately remains silent." *Id*. (quoting *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986)). "In general, once a party undertakes to speak, that party assumes a duty to tell the whole truth." *Id*. at 761.

A legal duty may arise when "one has placed special confidence in another where the latter is bound, in equity and good conscience, to act in good faith and with due regard for the interests of the other." *Id.* at 760-61. Actual fraud includes an intentional breach of duty designed to harm another or obtain an unfair advantage, while constructive fraud includes

16

breaches "that the law condemns as 'fraudulent' merely because they tend to deceive others, violate confidences, or cause injury to public interest, regardless of the actor's intentions." *Id*. at 761. A misrepresentation of a past or present material fact, made by one who has a duty to speak the truth, "is a frequent ground for recovery in fraud when another relies on the representation to her detriment." *Id.*

Dinwiddie's affidavit includes the required statutory statements and states that he: had "made the decision to execute this affidavit after deliberate and sober introspection of the consequences of my permanent actions"; acknowledged that he should not execute the document if he might want to exercise his parental rights at any time in the future; was not under the influence of "any significantly mind-altering substance"; and was signing the document "in a state of physical and emotional well-being." The affidavit also states:

> I have made the decision to execute this affidavit after deliberate and sober introspection of the consequences of my permanent actions
>
> **I ACKNOWLEDGE THAT THIS AFFIDAVIT RELINQUISHING MY PARENTAL RIGHTS TO [K.J.] IS IRREVOCABLE FOR 60 DAYS. I UNDERSTAND THAT MY PARENTAL RIGHTS MAY BE TERMINATED WITHIN THE 60 DAYS AFTER THE EXECUTION OF THIS DOCUMENT OR AT ANY TIME AFTER THE INITIAL 60 DAYS THAT THIS AFFIDAVIT HAS NOT BEEN REVOKED BY AFFIDAVIT. I ACKNOWLEDGE THAT IF MY PARENTAL RIGHTS EXIST AFTER THE 60 DAYS AND I DESIRE TO ATTEMPT TO REVOKE THIS RELINQUISHMENT; I MUST EXECUTE AN AFFIDAVIT REVOKING THIS RELINQUISHMENT OF PARENTAL RIGHTS.**

*See id*. § 161.103(e) (relinquishment that does not designate Department or licensed child-placing agency as managing conservator "is revocable unless it expressly provides that it is irrevocable for a stated period of time not to exceed 60 days after the date of its execution"). It

17

then goes on to set out the process to revoke the affidavit. *See id.* § 161.103(g) ("To revoke a relinquishment under subsection (e) the parent must sign a statement witnessed by two credible persons and verified before a person authorized to take oaths"; deliver copy of revocation to person designated in affidavit; and, if parent knows suit for termination based on affidavit has been filed, file copy of revocation with trial-court clerk).

Dinwiddie argues that the evidence did not establish that he had voluntarily executed the affidavit and instead that he proved as a matter of law that the affidavit was procured by fraud. He bases those arguments in large part on his contention that he and Pottin had a "special relationship" in which he looked to her as a mother figure and "placed special confidence" in her, giving Pottin the duty to tell him "the complete truth regarding the execution of the relinquishment affidavit." He asserts that Pottin breached that duty by not telling him "the truth as to revocability of the affidavit, the legal effect of the affidavit on Mr. Dinwiddie's status as a father, and the legal effect on Mr. Dinwiddie's ability to see his child." He further notes that he was not represented by counsel and that he testified that he did not have "proper time to go over the paper he signed" and did not understand how the revocation process worked.

Pottin agreed that she told Dinwiddie that he would continue to be K.J.'s father and would remain in the child's life and that the purpose of the termination and adoption process was at least in part to give the child access to GI Bill or other military benefits. She also agreed that Dinwiddie did not know that Pottin, Francis, and K.J. would be moving to Virginia when he signed the document. However, there is no evidence that Pottin made any of those statements with an intent to mislead Dinwiddie or to fraudulently procure his signature on the affidavit.

On its face, Dinwiddie's affidavit of voluntary relinquishment satisfies the requirements of the family code. *See* Tex. Fam. Code § 161.103. There was no evidence that

18

Dinwiddie did not read the affidavit or lacked the opportunity to do so, nor is there evidence that Pottin purposefully mischaracterized any of the affidavit's provisions with an intent to mislead Dinwiddie.[5] Dinwiddie testified that he could read English and had about three years of college-level education, and it was he who chose to sign the document.

Further, there was no evidence that Pottin and Francis intended to cut Dinwiddie off from K.J. when the affidavit was executed. At the new-trial hearing, Pottin explained that she had only limited Dinwiddie's contact after his conduct raised concerns about K.J.'s safety and whether he intended to abscond with the child. Although the parties testified that at the time Dinwiddie signed the affidavit, neither he nor Pottin knew that K.J. would be moving, Francis testified that she and Pottin intended to return to Texas once Francis retired and that "to the extent that the goal is to try and keep everybody together, including Mr. Dinwiddie, including Ms. Barnes, that would happen here." The record also includes evidence that Dinwiddie knew before he signed the affidavit that Pottin and the child had been spending time in Virginia, and Francis testified that she had talked to Dinwiddie about whether he would come visit the family.

Finally, although Dinwiddie asserted that he had been pressured into signing the affidavit without allowing himself time to discuss it with his parents, Pottin testified that she and Dinwiddie waited together in line to have his execution of the document witnessed and notarized and that Dinwiddie was impatient to finish the process and expressly declined to take a copy of the document with him. In addition, Barnes testified that she and Dinwiddie had discussed the termination/adoption process with Pottin and Francis, that they all agreed to it, that it was intended to be "a final thing," that they did not intend for the arrangements to be temporary, and

---

[5] Although Pottin was represented by an attorney, there is no indication that she has any legal training or had a better or different understanding of the effects of the affidavit than Dinwiddie would have had after reading the document.

19

that Dinwiddie and Barnes had intended to stay involved but give Pottin and Francis "all of the responsibility of being a parent." Because the affidavit satisfies section 161.103, Dinwiddie bore the burden to prove fraud, duress, or coercion. *See In re D.E.H.*, 301 S.W.3d 825, 830 (Tex. App.—Fort Worth, 2009, pet. denied). The trial court, as sole arbiter of witness credibility, *see In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009), was responsible for resolving the conflicts in the testimony and was within its discretion to resolve those issues against Dinwiddie.

Given the evidence related to Dinwiddie's execution of the affidavit and the language of the affidavit itself, *see In re R.B.*, 225 S.W.3d 798, 804 (Tex. App.—Fort Worth 2007, no pet.) ("Evidence that an affidavit of voluntary relinquishment was signed, notarized, witnessed, and executed in compliance with family code section 161.103 is prima facie evidence of its validity."), as well as the testimony presented, we hold that the court could have reached a firm belief or conviction that Dinwiddie's affidavit of relinquishment was executed in conformity with section 161.001, *see* Tex. Fam. Code §§ 101.007 (defining "clear and convincing evidence"). We further hold that the trial court could have concluded that Dinwiddie did not establish by a preponderance of the evidence that his affidavit was executed as a result of coercion, duress, fraud, undue influence, or overreaching. *See R.B.*, 225 S.W.3d at 804; *Vela*, 17 S.W.3d at 758; *see also re J.O.A.*, 283 S.W.3d at 346 (trial court has role of resolved evidentiary conflicts and determining issues relying on evaluation of witness credibility). The trial court thus had sufficient evidence to support its finding of grounds for termination under subsection (K) and did not abuse its discretion in denying Dinwiddie's motion for new trial. *See In re R.R.*, 209 S.W.3d 112, 114 (Tex. 2006) ("We review a trial court's denial of a motion for new trial for abuse of discretion."); *D.E.H.*, 301 S.W.3d at 830 (same). We overrule Dinwiddie's second, third, and fourth issues.

20

We now turn to Dinwiddie's first issue, which complains that the trial court erred in finding that there was clear and convincing evidence that termination of Dinwiddie's parental rights is in K.J.'s best interest.

The supreme court has explained that because section 161.211 of the family code limits an attack on a termination order based on an unrevoked affidavit of relinquishment "to issues relating to fraud, duress, or coercion in the execution of the affidavit," Tex. Fam. Code § 161.211(c), a parent contesting such a termination order may not ground their attack on a challenge to the legal or factual sufficiency of the evidence supporting the trial court's best-interest finding, *In re K.S.L.*, 538 S.W.3d 107, 111 (Tex. 2017). The trial court must find that termination is in the child's best interest, but section 161.211(c) limits our review to whether the affidavit was procured through fraud, duress, or coercion. *Id.* Further, "the affidavit itself, in the ordinary case, can be ample evidence to support a best-interest determination." *Id.*

> [E]ven under a clear-and-convincing standard, we think in the ordinary case a sworn, voluntary, and knowing relinquishment of parental rights, where the parent expressly attests that termination is in the child's best interest, would satisfy a requirement that the trial court's best-interest finding be supported under this higher standard of proof. . . . A parent's willingness to voluntarily give up her child, and to swear affirmatively that this is in her child's best interest, is sufficient, absent unusual or extenuating circumstances, to produce a firm belief or conviction that the child's best interest is served by termination. . . . The Legislature appears to agree, as it added subsection 161.211(c) to the Family Code, and thereby limited appellate review, after it amended section 161.001 to impose the clear-and-convincing standard.

*Id.* at 112.

The affidavit executed by Dinwiddie states, "It is in the best interest of the child for the parent-child relationship between myself and [K.J.] to be terminated," and we have already held that the trial court could have found (1) by clear and convincing evidence that

21

Dinwiddie voluntarily executed his affidavit of relinquishment and (2) that Dinwiddie did not establish by a preponderance of the evidence that his signature was procured through fraud, coercion, or duress. Thus, the face of the affidavit, in which Dinwiddie "expressly attest[ed] that termination is in the child's best interest," supports the trial court's best-interest finding. *See id.* at 112.[6] We overrule Dinwiddie's first issue presented.

---

[6] Even if we were to consider Dinwiddie's challenge, the trial court could have held by clear and convincing evidence that termination of Dinwiddie's rights was in K.J.'s best interest. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (best interest determined based on factors such as child's wishes, child's emotional and physical needs now and in future, emotional or physical danger posed to child now and in future, parenting skills of potential caregivers, programs available to assist potential caregivers to promote child's best interest, plans for child, stability of competing placements, conduct by parent that might show inappropriate parent-child relationship, and any excuses for parent's conduct); *see also L.R. v. Texas Dep't of Family & Protective Servs.*, No. 03-18-00125-CV, 2018 WL 3059959, at *1 (Tex. App.—Austin June 21, 2018, no pet.) (mem. op.) (child's need for permanence is paramount consideration when determining his present and future needs). Johnson testified that Dinwiddie seemed to have the means to provide for K.J.'s basic needs, that he had a bed and food for the child, and that he had obtained Medicaid and food stamps, and Pottin agreed that she and Francis had not brought up "any abuse or neglect grounds." However, the trial court also heard testimony about "cuts and sores," determined to be pressure ulcers caused by sitting for long periods of time in damp or wet conditions, found on or around K.J.'s anus after the child was in Dinwiddie's care; Dinwiddie's claimed lack of awareness of the sores or their cause; his use of babysitters he found on Facebook; and his admission to Richards that he had left the infant alone "in the middle of the night" when he went shopping. Further, although Dinwiddie testified that he had started to rearrange his work schedule to better accommodate his parenting role, testimony indicated that he worked nights at a job with questionable legality. Richards and Barnes both expressed concern about Dinwiddie having unsupervised access to K.J., with Richards saying he was "very lazy" about his parenting and Barnes expressing concerns about his work schedule and lack of parenting knowledge. And Lackmeyer reported that Dinwiddie had started to "make[] plans and cancel[]" his visits with K.J. and that Pottin ended up with primary caretaking responsibilities after Barnes and Dinwiddie "just did not show up to pick [K.J.] up," concluding that adoption by Pottin and Francis "appears to be in the best interest of" K.J. Finally, K.J. had primarily lived with Pottin and Francis for most of his life; had bonded to them; and will, through adoption, have access to GI Bill and other military benefits as well as a stable, permanent home.

22

## CONCLUSION

We hold that the trial court did not err in basing its termination order on subsection (K) due to Dinwiddie's execution of his affidavit of relinquishment and in finding that termination was in K.J.'s best interest. We need not consider Dinwiddie's remaining issues, which challenge the court's finding of grounds under subsections (B) and (C). *See Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.) ("Having determined that the evidence is sufficient to support the jury's finding on one of the statutory grounds, we need not consider whether the evidence would support other grounds for termination."). We affirm the trial court's order of termination and adoption.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Kelly
  Dissenting Opinion by Justice Triana

Affirmed

Filed:   April 15, 2022